**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **B. P. b/n/f JACK JAY AND** | § | |
| **JULIE POTTS,** | § | |
|     **Petitioners,** | § | |
| | § | |
| **v.** | § | **Civil Action <u>4:21-cv-709</u>** |
| **FRISCO INDEPENDENT** | § | |
| **SCHOOL DISTRICT,** | § | |
|     **Respondent** | § | |

<u>**PLAINTIFFS' COMPLAINT WITH JURY DEMAND**</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Jack Jay and Julie Potts a/n/f of B.P. (hereinafter referred to as the and all collectively as the "Plaintiffs") complaining of the Frisco Independent School District (hereinafter referred to as the "Frisco ISD" or "Frisco"), respectively, and files their *Complaint and Jury Demand* as more fully specified below. Plaintiffs reserve the right to replead this *Complaint* if new claims and issues arise upon further development of the facts, as permitted by law.  In support thereof Plaintiffs would respectfully supplement with the following

**I.  <u>NATURE AND PURPOSE OF THE ACTION</u>**

1.  When B.P. went to Cheerleading Practice at the Stafford Middle School, little did she know her life would change for ever.  Unlike football practice for boys who have trained staff in that area of expertise, B.P. was left with a teacher who was not.  Unlike football practice for boys who have very clear standards for what is a prohibited tacking or blocking practice, B.P. was forced to complete a stunt that was illegal for middle school students.  Unlike football practice for boys who have significant amount of safety equipment B.P. was forced to complete a dangerous stunt without a mat or even a spotter, which is required.  Unlike football practice for boys who

have staff trained in concussion protocols B.P. did not benefit from trained staff in this regard either.  Left to endure the above, B.P. was severely injured that day experiencing a severe concussion.  Even though her symptoms were obvious neither the assistant coach, coach or nurse called emergency medical services ("EMS") at all.  Apparently the Frisco Independent School District has an unwritten practice and custom which completely restricts and inhibits staff from calling for emergency medical services, even when the child is experiencing an obvious medical emergency. Not surprisingly this to provide necessary medical services in a timely manner, can have life-changing effects. That is exactly what happened in this case. Accordingly Plaintiffs bring forth civil rights claims pursuant to the Constitution of the United States and the statutes promulgated thereunder, to remedy the acts and omissions of the School District Defendant.

## II. <u>JURISDICTION</u>

**2.**     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the Fourteenth Amendments to the United States Constitution and the laws of the United States.

3.     Moreover this Court has supplementary jurisdiction over state and common law claims pursuant to 28 U.S.C. §1367.

## IV. <u>VENUE</u>

**4.**     Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Eastern District of Texas, Sherman Division.

## V. <u>PARTIES</u>

5.     B.P. is a citizen of the State of Texas, and at all pertinent times, a student at the Frisco Independent School District. Her parents are father Jack Jay Potts and mother Julie Potts who are also citizens of the State of Texas and residents of Denton County. They sue in their capacity as next friends. Their address is 4351 Mueller Lane, Prosper, Texas 75078.

6.     Defendant Frisco Independent School District is a school district organized under the laws of the State of Texas. Frisco ISD was at all pertinent times responsible for the care, management and control of all public-school business and transportation vehicles within its jurisdiction, the hiring, training and supervision of teachers at the School as to safety and supervision of students with and without disabilities within the district.  Defendant Frisco ISD may be served through its Superintendent, the Honorable Mike Waldrip, EdD, Superintendent at the Administrative Offices at 5515 Ohio Drive, Frisco, Texas 75035.  Plaintiffs reasonably the School District will be represented by the Honorable Meredith Prykryl Walker of Walsh Gallegos, Trevino, Russo and Kyle PC., 105 Decker Court, Suite 600, Irving, Texas 75062.

## VI.  STATEMENT OF FACTS- SAFETY IN SCHOOLS

A.     STANDARDS OF THE UNIVERSITY INTERSCHOLASTIC LEAGUE

7.     The University Interscholastic League (UIL) was created by The University of Texas at Austin to provide leadership and guidance to public school debate and athletic teachers. The purpose of the UIL is to organize and properly supervise contests that assist in preparing students for citizenship. It aims to provide healthy, character building, educational activities carried out under rules providing for good sportsmanship and fair play for all participants.

8.     UIL Subchapter E, Section 21 enumerates the responsibilities of a school district's superintendent. Among other things, the superintendent of a member school district shall educate UIL student participants, coaches and other appropriate persons on UIL rules that

could affect them, and monitor the school's compliance with UIL rules.   Pursuant to Texas Education Code §33.204, a coach, trainer, or sponsor for an extracurricular athletic activity may not encourage or permit a student participating in the activity to engage in any unreasonably dangerous athletic technique that unnecessarily endangers the health of a student. Additionally, there is a general danger of dance/tumble programs that is recognized by the National Center for Catastrophic Sport Injury Research ("NCCSIR").[1]

B.    MEDICAL CARE AND SAFETY FOR STUDENTS IN PUBLIC SCHOOLS

9.    The State Legislature contemplates that the physical health of students are paramount.  Among many other things, Texas Education Code §33.204 states that a School District may not encourage or permit a student participating in the activity to engage in any unreasonably dangerous athletic technique that unnecessarily endangers the health of a student.

10.    Additionally, the Texas Association of School Boards (TASB) has developed policies and procedures for the independent school districts in Texas.   While each district is able to develop their own, or modify the ones suggested based upon their own local needs, they are essentially the same throughout the state. For instance, the TASB has developed policies and procedures to address issues regarding nursing services, health care related services and those regarding the need for emergency procedures when such a need exists.

C.    SCHOOL BOARD POLICIES AND PROCEDURES

11.    For instance, the Frisco ISD has adopted a policies called FFA (LEGAL) and FFA (LOCAL) [STUDENT WELFARE- WELLNESS AND HEALTH SERVICES] which both reinforce the

---

[1]. https://nccsir.unc.edu/files/2013/10/NCCSIR-34th-Annual-All-Sport-Report-1982_2016_Table-Appendix.pdf

School District's duty to both know about a student's health care needs and how to address them.

12.     Additionally, there is a policy called FFAC (LEGAL) [WELLNESS AND HEALTH SERVICES- MEDICAL TREATMENT] which and among many other things, addresses the need for prompt emergency medical services in certain situations where a student's breathing is effected and life may even be at risk.

13.     There is an associated policy called FFAC (REGULATION) that addresses when School District personnel, often a nurse, both can and should administer medications, and especially when a life-threatening emergency exists. FFAC (EXHIBIT) contains guidelines as to when a staff member, including and especially a nurse, should address a student's immediate health needs.

14.     Policy FFAF addresses the need to develop what is termed an individual health care plan for students who have an identified health care need.  Many such students qualify for what is termed a Section 504 (of the Rehabilitation Act of 1973) Accommodation Plan addressing their medical needs. See FB (LOCAL) [EQUAL EDUCATIONAL OPPORTUNITY].

15.     Policy CK (LEGAL) [SAFETY PROGRAM/RISK MANAGEMENT] also supports all the above by requiring the District to have a Safety and Security Committee which has a duty to assure all the above is implemented.  This and other related policies were developed in accordance with the *Texas School Safety Center* administered through Texas State University in San Marcos, Texas.

16.     Policy CKD (LEGAL) [EMERGENCY MEDICAL EQUIPMENT AND PROCEDURES] and CKD (LOCAL) set forth the duties of school personnel to be able to respond to *Traumatic Injuries* including and especially when a student's ability to breath is compromised.

17.   CKD (EXHIBIT) provides a checklist and report that a school official must fill out when a student requires emergency medical services.

18.   The District has apparently developed a packet of information to give a parent if and when they know a student has experienced a concussion at school.

D.   PROFESSIONAL STANDARDS OF CARE

19.   Not surprisingly, the School Nurse is often the main person involved in effectuating these various policies and procedures as well as athletic and coaching staff.  The Texas Board Of Nursing ("BON") has developed a number of *Position Statements* for nurses in general and *Registered Nurses In The School Setting* in particular; see also 19 T.A.C. §153.1022(a)(1)(D). In fact the BON *Position Statement* 15.14 recognizes that the provision of nursing services in a school is a professional "specialty," meaning an ever higher standard of care and is expected. For all students where necessary an Individualized Nursing Plan is required. Importantly, and for a nurse in any setting, *see Position Statement* 15.15, they also have an independent  duty to a patient that cannot be superceded by, for instance, a school district policy; *see also* 22 T.A.C. §213.27- .29.

E.   BOYS AND GIRLS SPORTS AT THE FRISCO ISD

20.   The Frisco Independent School District has a significant portion of its budget centered around boys sports, including and especially football.  In concert with such an investment the District provides a significant amount of safety support, commensurate with the propensity for a football player to experience a concussion during practice or a game.   Of course this includes not only teeth guards and helmets, and shoulder and hips padding or shin guards but padding around equipment for tackling and blocking in practice to reduce the possibility of concussions. Certain types of spearing and other practices are outlawed because they can cause head injury.

Moreover, there are often multiple coaches around who are all required to receive specialized concussion training.  Moreover, the School Board in concert with University Interscholastic League ("UIL") standards of care monitor practice and games techniques to assure they are safe.

21.     It is now well-known throughout the educational and cheerleading communities that Girl's Cheerleading has a significant propensity for serious is injuries and concussions.  Yet the School District does not normally provide sufficient staff to monitor practice. Nor do they provide mats during practice.  Nor do they require female staff to receive specific concussion protocol training like their male football counterparts.   Nor do they monitor practice and performance activities to assure they are in concert with professional standards of care.  In summary the District does almost nothing to make the cheerleading experience for girls as safe as the football experience is for boys.

F.      SECTION 504 OF THE REHABILITATION ACT OF 1973

22.     Section 504 Of The Rehabilitation Act Of 1973, 29 U.S.C. §794 is a statute addressing discrimination based upon disability and is applicable in public schools, *see* 34 C.F.R. §104.31-104.37.

23.     An accommodation for a student with a disability is having professionally competent staff in general and especially during a time emergency medical care may be required.

24.     Of course, an essential accommodation is having staff able to recognize the need for immediate emergency medical care in non-emergent and especially emergent situations, and provide such care.

25.     In regard to all students with a disability staff must be provided protocols on how to reach Emergency Medical Services in a timely manner, when warranted.

## VI.  <u>FACTUAL RESUME ABOUT B.P.</u>

A.      ABOUT B.P.

26.     B.P. was born on August 17, 2007.

27.     At all times relevant to this case, she was a student at the Stafford Middle School with the

Frisco Independent School District ("Frisco ISD").

28.     Also, during the relevant time period giving rise to this cause of action she was participating

in the Middle School Cheer Program.

29.     On Friday morning November 8, 2019  Coach Amanda Oakley required B.P. to participate in

a stunt without a spotter in place, as apparently another student who normally would have been

in position to do so was injured and unavailable.

30.     There were two other stunt teams that had their backspots in place, but Coach Oakley, who was

in her first year, left B.P.'s group without a backspot.

31.     Importantly, the District also failed to provide the girl's cheer program a mat or some other

material that would have broken B.P.'s fall.

32.     Another student who was the designated Cheer Captain, and who was merely twelve years old,

warned Coach Oakley  that doing the stunt without a backspot was dangerous but  Oakley was

adamant and required B.P. to participate in the stunt anyway.

33.     Without the proper protections in place, whether it be another Coach, another student or a

safety mat, or all, it was inevitable that B.P. would fall. And fall she did, almost from a height

of eight feet, hitting the back of her head on the cafeteria floor.

34.     B.P. was injured at about 7:45am.  She received no immediate attention from Oakley, medical

or otherwise.

Original Complaint                                                                                              8

35.    B.P. almost immediately began to experience concussion like symptoms like dizziness, nausea and head and neck pain. She complained to Oakely. Even though Oakley knew of B.P.'s worsening condition she made B.P attempt the stunt again. Fortunately she did not fall. But her conditions worsened.

36.    At about 8:13am Coach Oakley finally emailed B.P.'s mother. In the email Oakley wrote that she brought B.P. to the nurse's office. She later learned this statement was false.

37.    After practice, B.P. went to her first period English class but her teacher, Ms. Snow was able to see that B.P. wasn't well and told her to go to the nurse. B.P. attempted to get to the Nurse Office but attempted to go to her locker. Because she alone, very confused, had double vision which also was becoming more and more sensitive it took her three (3) times to do so.

38.    When B.P. arrived at the nurses office, she complained of worsening headaches, light sensitivity, intermittent spots in her vision and neck pain. The nurse completed an initial inquiry. The Nurse also called other students who were witnesses into her office so she could a clearer picture of what had happened earlier in the morning. She soon determined what had been self-evident, B.P. had a concussion and required emergency medical care.

39.    The School Nurse called B.P.'s mom around 8:45am. The nurse stated (more or less) "Don't throw me under the bus, but the Coach is downplaying the situation. I have spoken with the other girls who were at the practice. You need to get here now and her to the E.R. She has a concussion" B.P.'s mother was very confused as she was not aware of what the nurse was talking about.

40.    Mother checked her email and there was a message from Coach Oakley that "B.P. hit her head a tiny bit on the stunt mat. I took her to go see the nurse at school, but she was not there yet. I did my own testing to see how B.P. was. She was normally responsive and wasn't feeling

nauseous or dizzy.  She said her head and neck hurt a little.  When B.P.'s mother arrived at the school around  9;00am, the nurse told B.P.'s mother again that B.P. had a concussion and she needed to be taken immediately to the  Hospital Emergency Room.  B.P. and her mother immediately left the school and started the 15 minute drive to the E.R.

41.     While in the car, B.P. showed multiple signs of a severe concussion.  She was very dizzy, extremely disorientated, and complained of double vision and headaches.  And unlike her usual self would not answer mother's questions but rather stare off into the distance. Mother noticed B.P. was not the bubbly and outgoing girl as usual.

42.     Due to the acts and omissions of Frisco ISD Staff, B.P. was injured.

43.     Staff never gave B.P. the concussion protocols their own School Policies required.

44.     No one with School District contacted Emergency Medical Services in a timely manner.  B.P. was not provided necessary medical care in a timely manner and upon reason and belief, posit that this affected emotionally at the time and exacerbated those injuries.

45.     Physically, B.P, also has decreased range of motion in her cervical spine with related hormonal and neurotransmitter imbalances. She has severe Post-Concussion Syndrome ("PCS") with Occipital and Frontal Lobe damage.  B.P also has a permanent functional neurological disorder, vision damage to her right eye and seizures.  When this occurs her brain shuts down.  She also has decreased physical stamina.

46.     Since that time B.P. continues to experience impulsivity and distractibility, vertigo, nausea, poor judgement, poor balance and depth perception, tremors, stiffness, and an increase of severity of Attention Deficit Hyperactivity Disorder ("ADHD") symptoms.

47.     Collectively she has what's called "brain fog." system, headaches and migraines, insomnia, nightmares, disrupted sleep patterns, memory issues, dizziness, fatigue, sensitivity to light and

sound, irritability and decreased mental health including mood swings, personality changes, severe depression, anxiety and *Post-Traumatic Stress Disorder*.

48. Mother later learned that  this stunt was also not sanctioned for Middle School Cheer Leading programs, according to the National Cheer Leading Organization that sets those rules for school cheer.

F. OTHER INSTANCES OF AN UNCONSTITUTIONAL CUSTOM AND PRACTICE

49. In addition, Plaintiffs allege that the failure of the School Nurse and Staff to contact Emergency Medical  Services was purposeful.  Moreover that such failure to attain medical services in a timely manner caused some injuries, exacerbated others and in some cases even caused a death. Here Plaintiffs list a few such other public cases, where a student in a Texas Public School, who have also required emergency medical services but their school district staff also refused to contact EMS.  In some cases it causes injuries, in others exacerbated them and even caused deaths.  They include but are not limited to:

 a. *The Estate of I.C.D., Deceased et al v. Beaumont ISD*; 1:18-cv-00137-MAC ( E.D. TX- Beaumont Division) where Plaintiffs alleged a child with significant disabilities died because staff with that School District failed to provide I.C.D. emergency medical services.  Among other things that cause of action alleged constitutional violations and claims of discrimination based upon disabilities;

 b. While that case was pending this Counsel attempted to amend that complaint and add as plaintiffs *The Estate of M.L. v. Spring ISD, The Estate of T.J. v. Aldine ISD and C.C. v. Pflugerville ISD.*  In addition to claims of discrimination based upon disability, and constitutional claims similar to those B.P. has pled above, the plaintiffs pled a conspiracy cause of action among the School District's in Texas, alleging that staff was

trained not to call emergency medical even in the face of medically necessary services. That court dismissed the I.C.D. case on limitations, denied the motion to amend and directed the remaining plaintiffs to file a new cause in the Houston Division of the Southern District;

c.  The cases of *The Estate of M.L. v. Spring ISD, The Estate of T.J. v. Aldine ISD and C.C. v. Pflugerville ISD* were all next filed in the Southern District- Houston Div. and set at C.A. 4:20-cv-1597 where each alleged their own constitutional claims, allegations of discrimination based upon disability and together a conspiracy claim. While that case was pending Counsel attempted to amend that complaint and add as plaintiffs *A.D.B. v. Hallsville ISD* and *B.P. v. Frisco ISD*, also including constitutional and discrimination based upon disability claims  as well as the above-noted conspiracy claims. The various school districts filed their respective motions to dismiss.  In their *Response* those plaintiffs let the Court know of other similar instances hoping that notice of these other instances would add support to the constitutional and conspiracy claims. They include the following.

i.  On or about January 17, 2017 Destiny Cano, who was then a student at the Harlandale Independent School District, experienced life-changing injuries while performing an excessively dangerous performance for a school pep rally. Even though her medical needs were overt the School Staff refused to call emergency medical services.  This case is filed in the Western District of Texas, San Antonio Division at Case 5:19-cv-01296-FB and alleged constitutional claims similar to those noted above as well as cliams of discrimination based upon disability.  The School District filed a motion to dismiss the constitutional

claims which was granted by the District Judge The discrimination based upon disability claims are still pending;

ii.    In April of 2016 A.I. was an 11 year old female student attending the Dallas Independent School District. One day she was seriously injured when forced to participate in an excessive physical exercise regime.  She was later diagnosed with rhabdomyolysis.  Even though her injuries were also overt the School Staff and Nurse likewise refused to contact emergency medical services.  That case was set at *Poloceno v. Dallas Independent School District*, No. 3:18-cv-01284-5 (N.D. TX- Dallas Division);[2]

iii.   Moreover, there was two drowning cases in the Houston Independent School District, the first was in the *Estate Of A.R. v. Houston Independent School District*, 4:10-cv-00533 (S.D. TX- Houston Division) where a staff member stated during an investigation that HISD staff were specifically trained not to call EMS. Also in the *Estate of C.A. v. Houston Independent School District*, 4:10-cv-00531 (S.D. TX- Houston Division) was another case where a student was drowning at a swimming pool and not one staff member ever called EMS, rather a student contacted 911.[3]

d.    That court also denied the motion to amend and add new parties. It granted the motions to dismiss on the constitutional and conspiracy claims, severed the M.L., T.J and C.C.

---

[2].  This case was dismissed on failure to state a Title IX Claim and was affirmed by the 5th Circuit, No. 20-10098, September 10, 2020.

[3].  In both of these cause the District Court dismissed the cause upon motions for summary judgment.  Each was appealed to the 5th Circuit where the decisions were affirmed.

cases into separate actions and sent the C.C. case to the Austin Division of the Western District.  The C.C. case was set at 1:21-cv-00232-RP. The School District filed a motion to dismiss on the remaining constitutional claims which was granted on or about March 29, 2021.  C.C. has since filed a notice of appeal with the 5th Circuit set at 21-50356.

e.      Plaintiffs M.L., T.J. and Cano have all filed rule 54(b) Motions asking their respective District Courts to severe the constitutional and conspiracy claims and issue a final leaving judgment on each, leaving those Plaintiffs able to join C.C. in his appeal and bring this issue before a panel at the Fifth Circuit Court of Appeals.

50.   Upon reason and belief and based upon all the above, Plaintiff alleges that during a training session or in a meeting for Staff where both formal and informal that discussions occur, Frisco Independent School District staff received the clear message not to contact emergency medical care for students who need such services.  Why? Maybe to avoid the cost. Or maybe to avoid having an ambulance show up and school and have that occurrence get into the rumor mill.  Or maybe to avoid contacting Child Protective Services. Or reporting it to the School Board.  Or reporting it to the Texas Education Agency. Or reporting it the County Coroner. In any case, B.P. was one such student where the custom and practice of School District personnel to not call for Emergency Medical Services when warranted, injured another Texas child.  In this case it was B.P.

## VII.  STATE ACTION

51.   The Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.   In addition, each sentence and paragraph below, likewise incorporates by reference as if fully set forth herein, the one above it.

52.     Frisco ISD was at all times and in all matters acting under color of state and federal law when they permitted B.P. to be subjected to the acts, omissions, wrongs and injuries hereinafter set forth.

### VIII.   UNCONSTITUTIONAL POLICIES, PROCEDURES, AND PRACTICES

53.     While in a public school  B.P.  has a constitutionally protected right to life, liberty and the pursuit of happiness, pursuant to the *Due Process Clause* of the 14th Amendment to the United States Constitution.

54.     The Frisco Independent District by and through its School Board, acting under color of law and acting pursuant to customs and policies of the district, deprived B.P. of rights and privileges secured to her by the Fourteenth Amendment to the United States Constitution and by other laws of the United States as noted in this section.

55.     The School District had an unwritten policy, procedure, practice and custom that is constitutionally infirm.  Specifically, that when a student would be experiencing a medical crisis at school staff were not permitted to contact emergency medical services, even if their independent awareness of any given situation, would otherwise mandated they do so. This unwritten but well-settled practice and custom, wasted valuable seconds where an injury and even one's life was held in the balance.  The failure to seek emergency medical services in a timely manner was a moving force in the injuries of B.P.

56.     Further, and likewise in addition and in the alternative to the failures noted above Frisco ISD failed to sufficiently *train* staff in health and safety practices for children in general, and for a child with a disability in particular, violating the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983, thereby. This failure was a moving force in the injuries to B.P.

57. Moreover and similarly in addition and in the alternative to the failures noted above Frisco ISD failed to sufficiently *supervise* staff in health and safety practices for children in general, and for a child with a disability in particular, violating the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983, thereby.  This failure was a moving force in the injuries of B.P.

58. In summary, Plaintiffs contend that the failure of the Defendant School District to assure that a student who requires emergency medical care receives such care in a timely manner, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983. The District surely knew of the dangers of not providing or securing emergency medical services, or should of known of the dangers of not providing a student in need, of emergency medical services in a timely manner, and as such disregarded the health and safety of student B.P.   Such acts and omissions by the School District Defendant rises to the level of deliberate indifference to B.P.'s welfare.

## IX.  CLAIMS FOR RELIEF UNDER TITLE IX OF THE EDUCATIONAL ACTS OF 1972

59. Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.*, ("Title IX") specifically notes that a public entity may be liable under Title IX for discrimination based upon gender or gender stereotypes. The claimant must be a member of a protected class; must be treated differently because of  membership in that class; the Respondent entity must be on notice as to the allegations; be deliberately indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or other damages. B.P. easily satisfies all these threshold requirements.

60. Further, the acts and omissions of the School District Respondent stand in sharp contrast to the safety measures that boys' sports receive, like football where are significant safety features to

guard against a male student getting a concussion, such difference creating a separate cause of action for violation of Title IX thereby.

## X.  CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT

61. The facts as previously described demonstrate violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

62. Each School District Defendant is deemed a "public entity" as defined in 42 U.S.C. §12131(1) and must thus satisfy the mandates of the ADA.

63. In addition, School District Defendant and its schools are facilities whose operation constitutes a program and services for ADA purposes.

64. Moreover once B.P. was injured, she too became a persons with a disability deserving protection and reasonable accommodations under the act, and she did not receive such protections or accommodations and likewise has a plausible claim under the ADA.

65. In addition and in the alternative, once B.P. was injured, she became a persons with a disability deserving protection and reasonable modifications and she did not receive such protections or modifications and likewise has a plausible claim under the ADA.

## XI. CLAIMS PURSUANT TO THE REHABILITATION ACT OF 1973

A.   FAILURE TO ACCOMMODATE CLAIM

66. Frisco ISD receives federal funds and thus must follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.  Moreover, the implementing regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and

individualized needs and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

67.     Plaintiffs assert that once B.P. was injured, she became a person with a disability. Nevertheless, the School District failed to provide her necessary accommodations and modifications commensurate with her then emerging disabling condition.

68.     Accordingly, she has a plausible claim under the Rehabilitation Act, similar to the one noted above pursuant to the ADA, of discrimination based upon disability.

B.      HOSTILE EDUCATIONAL ENVIRONMENT CLAIM

69.     In addition and in alternative to the above, Plaintiffs assert that when B.P. became a person with a disability the School District had a duty to provide her professional services in a manner to assure she was provided a safe and non-hostile educational environment. They did not do so and as such, she is a victim of discrimination based upon disability, and the District has violated Section 504 and injured her thereby.

## XII.  CLAIMS PURSUANT TO THE TEXAS HUMAN RESOURCES CODE

70.     Chapter 121 of the Texas Human Resources Code creates duties for public entity like a Public School District to fulfill, when serving the needs of a student with a disability like B.P.. in this cause. Those duties generally include the "duty to make reasonable accommodations in policies, practices and procedures." Texas Human Resources Code §121.003(d)(2).

71.     If a School District fails to provide a student with a disability covered by this Chapter necessary "reasonable accommodations" it creates a private cause of action for that person, pursuant to Texas Human Resources Code §121.004(b) and the aggrieved may seek damages to remedy such injuries.

72.    As the Defendant School District failed to provide B.P. reasonable accommodations and she was injured because of such failures, she seeks damages for mental anguish and other damages pursuant to the Texas Human Resources Code.

### XIII. RATIFICATION AND RESPONDEAT SUPERIOR

73.    The Defendant Frisco Independent School District School Board ratified the acts, omissions, customs and practices of school district personnel and staff.

74.    As a result, the Defendant Frisco Independent School District is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of each student pursuant to the theory of Respondeat Superior.

### XIV.   PROXIMATE CAUSE

75.    Each and every, all and singular, of the foregoing acts and omissions, on the part of a Frisco Independent School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

### XV.   DAMAGES

76.    As a direct and proximate result of the School District Defendants' conduct noted herein, B.P. has suffered injuries and damages, including but not limited to the following:

a.    Reasonable medical care and expenses in the past;

b.    Reasonable medical care and expenses in the future;

c.    Physical pain and suffering in the past;

d.    Physical pain and suffering in the future;

e.    Mental anguish in the past;

f.    Mental anguish in the future;

g.    Physical impairment in the past;

h.      Physical impairment in the future;

i.      Disfigurement in the past;

j.      Disfigurement in the future;

k.      Loss of equal access to educational opportunities;

l.      out-of-pocket expenses incurred by the family and

m.      Potential loss of earning capacity.

77.     By reason of the above subject of this lawsuit, Plaintiffs have suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

## XVI.  PUNITIVE DAMAGES

78.     The acts and omissions and of School District Defendant if true, amount to deliberate indifference. These acts and omissions of the Defendant School District, satisfy criteria for punitive damages, as contemplated by Section 1983.

## XVII.  COSTS OF REPRESENTATION AND ATTORNEYS FEES

79.     It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees, taxable costs and expert fees under 42 U.S.C.  §1983, §1985 and §1988(b), the Rehabilitation Act and the ADA pursuant to 42 U.S.C. §2000d *et seq*.

## XVIII.  DEMAND FOR JURY TRIAL

80.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendant Frisco Independent School District, in the manner and particulars noted above, and in an amount sufficient to fully compensate

them for the elements of damages enumerated above, recovery of attorney's fees and costs for the

preparation and trial of this cause of action, and for its appeal if required, together with pre- and post-

judgment interest, and court costs expended herein, and for such other relief as this Court in equity,

deems just and proper.

Respectfully submitted,

Cirkiel & Associates, P.C.

/s/ Mr. Martin J. Cirkiel, Esq.
Mr. Martin J. Cirkiel
SBN: 00783829
Federal Bar No. 21488
marty@cirkielaw.com
Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]; and

Mr. Anthony O'Hanlon, Esq.
Anthony O'Hanlon, P.C.
SBN 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]

**ATTORNEYS FOR PLAINTIFFS**